UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JOHN R. ATCHLEY, a married man,
and MICHAEL R. GILROY, a married
man,

               Plaintiffs,

        v.

PEPPERIDGE FARM, INC., a
Connecticut Corporation,

               Defendant.

No. CV-04-0452-FVS

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

**THIS MATTER** came before the Court for trial on February 23, 24, and 25, 2009.  John F. Bury, appeared for Plaintiff/Counterdefendant ("Mr. Gilroy").  Forrest A. Hainline and Robert B. Bader appeared for Defendant/Counterclaimant ("PFI").

The following witnesses testified in open court:  Michael Gilroy, Chris Baker, Kyle Jordan, Martin Petrilli, Danny Payton, Michael Sorich, and Rick Allessio.  The parties additionally submitted the deposition of Harold Rupp in its entirety as well as the designated deposition testimony of Michael Sorich, Mark Dollbaum, Chris Baker, Ronald Woolsey, Rick Allessio (December 11, 2007, and June 20, 2007), Danny Payton, Martin Petrilli, Michael Muro and Clare Bogle.  All of the exhibits admitted in evidence have been reviewed and considered by the Court, some of which are referenced below.

Having considered all of the foregoing evidence, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ.  P. 52(a).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

**FINDINGS OF FACT**

The Court makes the following findings of fact from the evidence and testimony presented at trial:

1.  Mr. Michael Gilroy commenced operation of his Pepperidge Farm route in May 2003.

2.  In May 2003, Mr. Gilroy obtained financing though Bank of America to purchase the PFI distributorship.  PFI was a guarantor of Mr. Gilroy's financing.

3.  In July 2003, Mr. Gilroy first placed his distributorship on the market for sale in response to a change of PFI policy with respect to stale product.

4.  Mr. Gilroy's initial asking price was $275,000, which included his truck and handheld computer.  Exh. 22.

5.  Mr. Gilroy later took his route off the market; however, in August 2004, he again marketed his distributorship for sale.

6.  Mr. Gilroy's asking price was lowered to $267,621 in August 2004.

7.  On each occasion, Mr. Gilroy chose not to hire a broker and marketed his route by placing advertisements in the newspaper.

8.  Mr. Gilroy testified that he received calls from a couple of people interested in the route.  Mr. Gilroy informed the interested parties that the distributorship entails hard work and long hours for very little money.

9.  Mr. Gilroy stated that he could not in good faith sell the route to anybody.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

10.   In October 2004, Mr. Gilroy informed PFI that he would no longer accept deliveries for four stores on his route, two Safeway stores, a Walmart and a Rosauers' superstore.  Exh. 20.

11.   In an October 22, 2004, letter, Mr. Gilroy wrote that PFI had informed him that PFI would be moving to remove the four stores from his territory, PFI would make arrangements to cover the stores at Mr. Gilroy's expense, and the stores would not be included in the ultimate sale of Mr. Gilroy's route, thus devaluing his business and investment.  Exh. 20.

12.   In November 2004, the underlying lawsuit was filed alleging that the distributorships were "demonstrably unprofitable."  (Ct. Rec. 1 ¶ 5.3).

13.   After the lawsuit was filed, Mr. Gilroy wrote a letter to PFI indicating that he and John Atchley had begun to notify "all our customers" of the situation.  Exh. 269.

14.   Mr. Gilroy testified that he told a few people, but not all of his customers.

15.   Rick Allessio, a PFI District Sales Manager, testified that he discovered Mr. Gilroy and Mr. Atchley had told their customers about the lawsuit.

16.   On January 7, 2005, Mr. Gilroy, through counsel, informed PFI that after January 21, 2005, he would no longer accept deliveries for any of his stores because his distributorship had become demonstrably unprofitable.  Exh. 255.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

17.  The January 7, 2005, letter provided PFI notice "so that [PFI's] clients have [an] opportunity to cover the territory beginning Monday, January 24."  Exh. 255.

18.  Mr. Gilroy thereafter defaulted on his Bank of America Loan.

19.  Bank of America demanded payment from PFI.  PFI paid off the loan in the amount of $244,761.76.

20.  To recover the amount paid to Bank of America, PFI attempted to sell Mr. Gilroy's former distributorship.

20.  In the interim, PFI operated the distributorship as a company operated route.

22.  Chris Baker, a Director of Retail Operations for PFI, testified that PFI is not in the business of running distributorships.

23.  It was nevertheless imperative that PFI continued servicing the stores on the route in order to maintain its product in the stores.

24.  In order to operate the route, PFI had to secure equipment, a depot, trucks and manpower.  In addition, PFI had to train the manpower it employed to service the route.

25.  Mr. Gilroy indicated he trained for five or six weeks prior to commencing his distributorship.

26.  Harold Rupp, a March 2007 purchaser of a portion of Mr. Gilroy's former route, stated that he trained for a month and a half prior to taking on the distributorship.

27.  PFI had to train new employees because the temporary worker previously employed to service the four stores Mr. Gilroy refused to

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

service in October 2004, Dave Rudder, was deemed to be not reliable, and Dale Wallach, Mr. Atchley's former employee, was not interested in working for PFI.

28.   In addition to hiring manpower to service Mr. Gilroy's former route, Rick Allessio and Dale Malsom, PFI's District Sales Managers, had occasion to operate the route.

29.   The total expenses incurred by PFI to operate Mr. Gilroy's former route exceeded the commissions it received by $25,630.08.  Exh. 259.

30.   Mr. Baker testified regarding PFI's efforts to market for sale Mr. Gilroy's former route.

31.   Mr. Baker has been involved in the marketing for sale of 225 routes.

32.   Mr. Baker indicated that 90% of distributorships are sold to individuals in the grocery trade industry in the same geographic location as the route.  The other 10% may include individuals from different geographic locations with preexisting interface with PFI.

33.   Mr. Baker testified that PFI never uses brokers, because brokers essentially perform the same function as PFI employees perform to market a distributorship.  He stated that brokers do not offer anything extra.

34.   Kyle Jordan, a Director of Distributor Development for PFI, testified that PFI utilizes the same mediums to market routes as brokers.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

35.  Mr. Jordan estimated that distributor-to-distributor routes sell in two to three months and company operated routes sell in six to nine months.

36.  Mr. Baker testified that distributor-to-distributor sales generally take two to four months, while the sale of company operated routes generally take between three and six months.

37.  Mr. Baker testified that the reason company operated routes take longer to sell is because the best person to promote the sale of the route, the distributor, is unavailable.

38.  On March 24, 2005, PFI first conducted an open house for the sale of Mr. Gilroy's former distributorship.

39.  The asking price for Mr. Gilroy's former distributorship was $251,000.

40.  To advertise the March 24, 2005, open house, flyers were distributed to the target audience, grocery industry individuals within the geographic area where the route was located (Exh. 205), and PFI employees spread the word to generate interest ("word of mouth").

41.  In addition, an advertisement announcing the open house was placed in the Spokane Spokesman-Review for two consecutive Sundays leading up to the March 24th open house.  Exh. 216.

42.  Mr. Baker received four calls in response to the advertisements.  Exh. 225.

43.  All four individuals who called in response to the advertising attended the March 24th open house.  However, no one sought to purchase the route.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

44.   On July 13, 2005, PFI conducted its second open house for the sale of Mr. Gilroy's former distributorship.  PFI chose a different day of the week and different locale in an attempt to attract interest.

45.   The asking price for Mr. Gilroy's former distributorship was $251,000.

46.   To advertise the July 13, 2005, open house, flyers were again distributed (Exh. 206) and PFI employees continued to use word of mouth in an attempt to generate interest.

47.   In addition, newspaper advertisements announcing the open house were placed in the Spokesman-Review, the Seattle Times and the Portland Oregonian.  Exh. 212.  Mr. Baker received two calls in response to the advertising.  Exh. 226.

48.   The two callers attended the July 13, 2005 open house.

49.   Again, no one sought to purchase the route.

50.   Prior to the July 13, 2005, open house, Mr. Gilroy's former route was also listed for sale on PFI's website.  Exh. 29.  The asking price for Mr. Gilroy's former route was listed on the website at $251,000.

51.   On September 4, 2005, PFI again advertised routes for sale in a newspaper ad with the Spokesman-Review.

52.   With respect to this September 4, 2005, Spokesman-Review ad, five people inquired.  Exh. 228.  No one sought to purchase the route.

53.   On February 9, 2006, PFI conducted a third open house for the sale of Mr. Gilroy's former distributorship.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

54.  To advertise the February 9, 2006, open house, flyers were again distributed (Exh. 207), and PFI employees continued to share information on the routes with vendors and grocery store employees.

55.  The flyers advertising the February 9, 2006, open house added Mr. Baker's cell phone number and Mr. Allessio's cell phone number for additional contact numbers for interested individuals. Exh. 207.

56.  Newspaper advertisements announcing the February 9, 2006, open house were placed in the Spokesman-Review for the Sunday, Wednesday and Sunday prior to the open house.  Exh. 214.

57.  By the time of the February 9, 2006, open house, Mr. Baker changed the way he was marketing the route by not listing a price and instead indicating that offers were being accepted for the route.

58.  The purpose of indicating that offers were now being accepted, as opposed to listing a price, was to attempt to generate as much interest in the route as possible by not turning anybody away based solely on the price.

59.  Mr. Baker received four calls in response to the advertising.  Exh. 227.

60.  The four callers attended the open house, and Mr. Baker spoke with each at the open house.  No one offered to purchase the route.

61.  On March 23, 2006, PFI conducted a fourth open house for the sale of Mr. Gilroy's former distributorship.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

62.   To advertise the March 23, 2006, open house, flyers were again distributed.   Exh. 208.

63.   In addition, an ad was placed in the Spokesman-Review for the two Sundays prior to the open house.

64.   Martin Petrilli attended the March 23, 2006, open house.

65.   Mr. Petrilli learned of the March 23, 2006, open house from speaking with PFI's District Sales Manager Rick Allessio, and also saw an ad for the open house in the Spokesman-Review.

66.   Mr. Petrilli has been a distributor of PFI products off and on since 1984.   He learned of his first route by word of mouth and sold that route by advertising in a local newspaper.   He learned of his next route by word of mouth, sold a portion of that route to an acquaintance and the remainder of that route was sold following his placement of an ad in a newspaper.   In 2000, word of mouth led to the purchase of his next route.   He later sold this route by advertising it in a local newspaper.

67.   Mr. Petrilli has never used a broker to sell his routes.

68.   Mr. Petrilli set his own prices for the sales of his routes and based the prices on "common knowledge" of the going rate at the time.

69.   Mr. Petrilli testified that he viewed the route he purchased as distressed because it was a company operated route.   He made an offer of $75,000 which was accepted.   No negotiation of the price occurred.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

70.   Beginning in 2006, PFI also used magnetic signs and bumper stickers on its vehicles to advertise routes for sale.

71.   In July 2006, PFI also marketed the routes for sale by securing 60-second radio advertisements in the Spokane and Seattle markets.

72.   The radio ads were run three times a day for three weeks and cost PFI $22,950.00.

73.   Mark Dollbaum, PFI's Business Development Manager for the Western Region, ran ads in the Spokesman-Review in late 2006.

74.   Mr. Dollbaum opined that these ads "are highly ineffective" and that PFI is "[w]asting our money on these advertisements."

75.   Nevertheless, PFI continued to utilize newspaper advertising to market its routes for the sake of the distributor.

76.   On November 29, 2006, PFI conducted a fifth open house for the sale of Mr. Gilroy's former distributorship.

77.   Michael Sorich, Manager of Retail Operations for PFI, testified that for nine consecutive days he handed out flyers (Exh. 211) and spoke with grocery industry personnel in an attempt to generate interest in the November 29, 2006, open house.

78.   The November 29, 2006, open house was also advertised in the Spokesman-Review for three consecutive Sundays prior to the open house as well as in a small newspaper, The Pinch, for two consecutive Wednesdays prior to the open house.

79.   Nobody attended the November 29, 2006, open house.

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

80.   In December 2006, Danny Payton, a 25-year employee of the grocery store Albertsons, contacted Mr. Malsom to express interest in a PFI route.

81.   Mr. Payton first attempted to buy an available distributorship owned and operated by Dan Rock, a PFI distributor serving the Spokane region.  However, Mr. Rock's distributorship was priced higher than Mr. Payton could afford.

82.   Mr. Payton was then told by PFI personnel "to make an offer" on the company operated routes PFI had for sale.

83.   Mr. Payton's offer of $68,000 on a portion of Mr. Gilroy's former route was accepted by PFI.  No negotiation of the price occurred.

84.   In March of 2007, Harold Rupp purchased the remaining portion of Mr. Gilroy's former route, bundled with a portion of Mr. Rock's route.

85.   Mr. Rupp learned of the distributorship opportunity through his wife, who worked at a grocery store.  Mr. Rupp's wife saw a flyer advertising PFI distributorships on a grocery store bulletin board.

86.   In addition to placing a call to a PFI district manager to learn more, Mr. Rupp viewed route information on PFI's website.

87.   Mr. Rupp ultimately accepted PFI's offering price of $88,000.00 for the distributorship.

88.   With respect to this sale, the ratio of the portion of Mr. Gilroy's former route, sales to price, was 14.6 to 1, while the ratio of Mr. Rock's portion, sales to price, was 31.8 to 1.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

89.  Mr. Gilroy's former route was sold in two portions for a total of $123,636.00, leaving a deficiency of $121,125.76.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law from the evidence and testimony presented at trial:

1.  Because Mr. Gilroy defaulted on his Bank of America loan and PFI paid off that loan, PFI had a right to sell Mr. Gilroy's former route to recover the amount it paid to Bank of America.  Wash. Rev. Code § 62A.9A-610(a) (A party who has taken a security interest in collateral may sell the collateral in the event of default).

2.  Every aspect of such a sale, "including the method, manner, time, place, and other terms, must be commercially reasonable."  Wash. Rev. Code § 62A.9A-610(b).  If a sale is not conducted in a commercially reasonable manner, the liability of the debtor will be reduced.  Wash. Rev. Code § 62A.9A-626(3).  When the amount of a deficiency is in issue, there is a rebuttable presumption that the secured party has complied with the UCC's requirements.  Wash. Rev. Code § 62A.9A-626(a)(1).  If the debtor "places the secured party's compliance in issue," the burden of proving compliance shifts to the secured party.  Wash. Rev. Code § 62A.9A-626(a)(2).

3.  Mr. Gilroy has placed Defendant's compliance with the commercial reasonableness requirement in issue, therefore, Defendant bears the burden of proving, by a preponderance of the evidence, that the sale of Mr. Gilroy's former distributorship was commercially reasonable.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12

    4.  A sale is commercially reasonable if made,

    (1) In the usual manner on any recognized market;

    (2) At the price current in any recognized market at the time of the disposition; or

    (3) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Wash. Rev. Code § 61A.9A-627(b).

**_PRICE_**

    5.  As previously held by this Court, the below market value price received for the sale of Mr. Gilroy's distributorship is not a fact dispositive of the issue of commercial reasonableness.  Wash. Rev. Code § 62A.9A-627(a).  However, "a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable."  Wash. Rev. Code § 62A.9A-627 Comment 2.

    6.  While the price received for Mr. Gilroy's former route was clearly low, there is no evidence that there were other buyers who would have paid more for the route or that PFI could find such a buyer, nor is there any evidence that the buyers of his former route would have or could have paid more.

    7.  Mr. Gilroy had walked away from his former distributorship and it was now a company operated route, as opposed to a distributor operated route, and viewed in the marketplace as a distressed enterprise.

///

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13

8.   Moreover, given the negative comments by Mr. Gilroy to not only his former customers on the route but also to prospective buyers of his former route, it is clear the market for the distributorship had been soured.

9.   Although the price PFI received for Mr. Gilroy's former distributorship was low, it is logical that the route would have commanded a lower price in the marketplace based on these facts.

### REASONABLE EFFORT

10.  PFI was required to use its "best efforts" to obtain the highest price it could for Mr. Gilroy's former distributorship.  *Rotta v. Early Indust. Corp.*, 47 Wash. App. 21, 24, 733 P.2d 576 (1987).

11.  The evidence overwhelming shows that PFI extensively marketed Mr. Gilroy's former route through newspaper advertising, word of mouth, written flyers, open house meetings, and by using magnetic signs and bumper stickers on vehicles it used to service the routes. PFI additionally posted information on its internal and external websites about routes for sale and used radio advertising in Seattle and Spokane.

12.  To advertise the March 24, 2005, open house, an advertisement announcing the open house was placed in the Spokesman-Review for two consecutive Sundays leading up to the March 24th open house.  Exh. 216.  PFI received four calls in response to the advertisements.  Exh. 225.

13.  To advertise the July 13, 2005, open house, newspaper advertisements announcing the open house were placed in the Spokesman-

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

Review, Seattle Times and The Oregonian.  Exh. 212.  PFI received two calls in response to the advertising.  Exh. 226.

14.  On September 4, 2005, PFI again advertised routes for sale in a newspaper ad with the Spokesman-Review.  Five people inquired with respect to this ad.  Exh. 228.

15.  To advertise the February 9, 2006, open house, newspaper advertisements announcing the open house were placed in the Spokesman-Review for the Sunday, Wednesday and Sunday prior to the open house. Exh. 214.  PFI received four calls in response to the advertising. Exh. 227.

16.  To advertise the March 23, 2006, open house, an ad was placed in the Spokesman-Review for the two Sundays prior to the open house.

17.  While no one attended the November 29, 2006, open house, PFI advertised the open house by placing an ad in the Spokesman-Review for three consecutive Sundays prior to the open house as well as in a small newspaper, The Pinch, for two consecutive Wednesdays prior to the open house.

18.  Although Mr. Dollbaum testified that newspaper advertising of distributor routes is ineffective and a waste of money, this is only one opinion on the matter that is not echoed by others.  Mr. Baker and Mr. Jordan each support the use of newspaper advertising to market PFI distributorships, and it is clearly a common means for distributors to market their routes for sale as evidenced by the testimony of Mr. Petrilli, Mr. Gilroy, and Mr. Payton.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 15

19.  Moreover, newspaper advertising is only one form of marketing utilized by PFI in this case.

20.  PFI additionally marketed Mr. Gilroy's former route through word of mouth, written flyers, and open house meetings, by using magnetic signs and bumper stickers on vehicles it used to service the routes, and by posted information on its internal and external websites.

21.  In July 2006, PFI also marketed the routes for sale by securing 60-second radio advertisements in the Spokane and Seattle markets.  The radio ads were run three times a day for three weeks.

22.  Based on the foregoing, PFI's marketing for sale of Mr. Gilroy's former route was commercially reasonable.  Wash. Rev. Code § 61A.9A-627(b)(3) (A sale is commercially reasonable if made in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition).

***DAMAGES***

23.  PFI is entitled to recover the deficiency of $121,125.76 ($244,761.76 - $123,636.00) from Mr. Gilroy.

24.  PFI is also entitled to recover is costs and reasonable attorneys' fees under the note and Security Agreement.

25.  At trial, PFI requested the Court require Mr. Gilroy to reimburse PFI for the fees associated with advertising the route for sale ($25,200.00) as well as for the expenses PFI incurred operating Mr. Gilroy's former route ($25,630.08 (Exh. 259)).

///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 16

26.    The Final Pretrial Order in this case notes that PFI seeks reimbursement from Mr. Gilroy for the deficiency he owes, plus costs and attorney's fees, but makes no mention of these additional expenses.

27.    While PFI's counterclaim does request "such other and further relief as the Court may [d]eem proper" (Ct. Rec. 192 at 6 (04-CV-0453-FVS)), these additional expenses were not specifically pled in the counterclaim.    The Court declines to award PFI any additional expenses in this case.

**CONCLUSION**

After a bench trial, the Court finds that PFI's marketing for sale of Mr. Gilroy's former route was commercially reasonable.    Wash. Rev. Code § 61A.9A-627(b)(3).    Consequently, this Court finds in favor of PFI and against Mr. Gilroy on PFI's counterclaim and enters this order accordingly.

**IT IS SO ORDERED.**    The District Court Executive shall forward copies of this Findings of Fact and Conclusions of Law to counsel, enter judgment in favor of Defendant and against Mr. Gilroy on Defendant's counterclaim, and **CLOSE THE FILE.**

**DATED** this   12th   day of March, 2009.


                    S/Fred Van Sickle
                    Fred Van Sickle
            Senior United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW – 17