UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JOHN R. ATCHLEY, a married
man, and MICHAEL GILROY, a
married man,

               Plaintiffs,

    v.

PEPPERIDGE FARM, INCORPORATED,
a Connecticut corporation

               Defendant.

NO. CV-04-452-EFS

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER**

**THIS MATTER** came before the Court for bench trial on December 3-5, 2012. Howard R. Morrill and John F. Bury appeared for Plaintiffs John Atchley ("Mr. Atchley") and Michael Gilroy ("Mr. Gilroy") (collectively, "Plaintiffs"). Forrest A. Hainline and Robert B. Bader appeared for Defendant Pepperidge Farm, Inc. ("PFI").

The following witnesses testified in open court: Jason Godwin, Dale Wallach, John Atchley, Michael Gilroy, Sean Black, Ronald Woolsey, Chris Baker, Martin Petrilli, Rick Allessio, Bert Stella, Dan Payton, and Dan Alan Hungate. The parties additionally submitted the designated deposition testimony of John Atchley (February 23, 2005, and October 17, 2007) and Sean Black (February 27, 2012). The Court received into evidence the following trial exhibits: Plaintiffs' Exhibits 1-6, 8, 10-

1    16, 19-20, 22-24, 33-34, 36-37, 39, 43, 45, 50-53, 56, 61-62, and 64-66;

2    and Defendant's Exhibits 511, 540, 543-544, 567, 573, and 593-599.

3         Having fully considered the issues and legal authority presented by

4    the parties, the testimony of the witnesses, the admitted trial exhibits,

5    and the arguments of counsel, the Court now enters the following Findings

6    of Fact, Conclusions of Law, and Order, pursuant to Federal Rule of Civil

7    Procedure 52(a).

8

9                        **I.    PROCEDURAL HISTORY**

10        Mr. Atchley and Mr. Gilroy originally filed separate actions, Nos.

11   CV-04-0452-EFS and CV-04-0453-FVS, respectively, in 2004; both cases were

12   eventually assigned to Senior Judge Fred Van Sickle.  In 2006, Judge Van

13   Sickle granted partial summary judgment for PFI and dismissed the

14   majority of Plaintiffs' claims, including their claim under the Franchise

15   Investment Protection Act, RCW Chapter 19.100 ("FIPA").  ECF No. 157, No.

16   CV-04-0452-EFS; ECF No. 152, No. CV-04-0453-FVS.  The cases were

17   subsequently consolidated as No. CV-04-0452-EFS.  ECF No. 296, No. CV-04-

18   0452-EFS.  Judge Van Sickle subsequently granted summary judgment on

19   Plaintiffs' lone remaining claim, a claim for negligent

20   misrepresentation.  ECF No. 474.  Following that summary judgment, the

21   only remaining claim was PFI's counterclaim against Mr. Gilroy, in which

22   PFI sought a deficiency judgment based on Mr. Gilroy's failure to repay

23   the loan which allowed him to purchase a Pepperidge Farm distributorship.

24   Judge Van Sickle found that factual issues about whether the forced sale

25   of Mr. Gilroy's distributorship was commercially reasonable precluded

26   summary judgment, and the matter proceeded to trial.  *Id.*

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 2

1    After a three-day trial in February 2009, Judge Van Sickle entered
2 findings of fact and conclusions of law, finding that the sale was
3 commercially reasonable and entering judgment for PFI against Mr. Gilroy
4 on PFI's counterclaim.  ECF No. 679.  Plaintiffs appealed to the Ninth
5 Circuit, which largely affirmed Judge Van Sickle's rulings but reversed
6 his decision with respect to Plaintiffs' FIPA claim.  ECF No. 709.  The
7 Ninth Circuit concluded that a genuine dispute of material fact precluded
8 summary judgment as to whether Plaintiffs paid a franchise fee, and it
9 remanded the matter for further proceedings.  *Id.*

10   On remand, Judge Van Sickle recused himself, ECF No. 720, and the
11 case was reassigned to the undersigned Judge.  ECF No. 721.  The Court
12 subsequently denied separate motions for summary judgment on Plaintiffs'
13 remaining FIPA claim by Plaintiffs, ECF No. 782, and by PFI, ECF No. 826.

14

15                         **II.  FINDINGS OF FACT**

16   The Court makes the following findings of fact:

17 ***A.   Purchase of and Terms Governing Plaintiffs' Distributorships***

18   1.   PFI is a producer of baked goods, which it sells in retail food
19        stores throughout the United States.  In order to deliver its
20        products to its customers, PFI enters into consignment
21        agreements with third-party independent contractors, to whom
22        it grants geographically exclusive distributorships subject to
23        certain terms and conditions.

24   2.   In May 2003, Mr. Gilroy purchased a PFI distributorship from
25        David Spangler for $299,550 and began operating it.

26

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 3

3. At the time of Mr. Gilroy's purchase, Mr. Spangler was still operating that business. During the purchase process, Mr. Gilroy spent four to five weeks investigating the distributorship, including "riding along" nearly every day, Monday through Friday, with Mr. Spangler while he operated the business.

4. In May 2004, Plaintiff John Atchley purchased and began operating a PFI distributorship previously owned by Jason Godwin for $225,000.

5. At the time of Mr. Atchley's purchase, Mr. Godwin had ceased operating the business, and PFI had begun operating the distributorship on Mr. Godwin's behalf.

6. Although he represented to PFI that he was providing a $25,000 down payment and only financing $200,000 of the distributorship's purchase price, Mr. Atchley actually took out a separate loan to finance the $25,000 down payment and did not disclose that fact to PFI. Had PFI been aware that he was financing 100% of the purchase price of the distributorship, PFI would not have granted the distributorship to Mr. Atchley.

7. For both purchases, payment was nominally made, either in whole or in part, to PFI, which facilitated the purchase and sale. PFI credited the payments to outstanding loans or other financial obligations owed by the selling distributors; it then furnished all remaining moneys directly to the selling distributors.

//

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 4

8. In connection with Plaintiffs' purchase of the PFI distributorship businesses, each Plaintiff voluntarily entered into a separate Consignment Agreement with PFI.

9. PFI granted each Plaintiff the "exclusive right to distribute [PFI food products] to retail stores" within their respective territories. Ex. 1, at 23; Ex. 2, at 2.

10. Plaintiffs did not pay or agree to pay, and were not required to pay, PFI for the right to enter into their respective Consignment Agreements.

11. Plaintiffs were entitled to receive and did receive commission payments for the sale of PFI's goods; the amounts of these payments varied depending on the type of products they distributed and the manner of distribution.

12. For products listed in Schedule B of the Consignment Agreement, Plaintiffs were entitled to receive "a percentage of the net proceeds of such sales . . . calculated at the rate of 20%[.]" Ex. 1, at 34; Ex. 2, at 14.

13. Plaintiffs were entitled to receive commissions "at the rate of 25% to distribute certain products on a temporary, non-exclusive basis[.]" Ex. 1, at 36; Ex. 2, at 15.

14. Despite the territorial exclusivity provision of the Consignment Agreements, PFI retained the ability to sell and deliver its products to customers in Plaintiffs' territories "in connection with temporary sales programs." Ex. 1, at 23; Ex. 2, at 2.

//

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 5

15. Plaintiffs were prohibited from delivering PFI's products "to any [retail chain store] via a central or district warehouse or in any manner other than directly to its retail stores[.]" Ex. 1, at 24-25; Ex. 2, at 3-4.

**B.    *The Pallet Delivery Program***

16. At a point unknown, but before Plaintiffs purchased their distributorships, PFI implemented a pallet delivery program ("PDP") at the request of its customers.

17. As part of the PDP, PFI prepared and delivered entire pallets of their products to their customers as part of temporary sales programs for grocery and "club" stores.

18. PDP sales were negotiated between PFI and a retail store's headquarters or corporate office; PFI did not negotiate such sales directly with the retail stores.

19. For pallet sales under the PDP, PFI created trays of goods, shrink-wrapped them, and put them on pallets with slip sheets and corner posts. Using PFI employees and PFI trucks, PFI delivered these pallets directly to their customers' central warehouses. PFI's customers in turn shipped the palletized product directly to their own retail stores, where the product was sold from PFI's display-ready pallets.

20. PFI's palletized product typically sells three times faster than the product its distributors place on retail shelves.

21. Plaintiffs did not accept orders for palletized product, did not accept delivery of those pallets from PFI, and did not deliver the pallets to PFI's customers.

22. For palletized product that PFI delivered to customers' warehouses or cross-docking facilities, PFI's costs to prepare and deliver those pallets averages $85 for mini pallets and $185 for full pallets.

23. Plaintiffs were contractually prohibited from delivering pallets to PFI's customers, and thereby receiving commissions for such sales, in their respective territories, pursuant to paragraphs 1 and 9 of their Consignment Agreements. Ex. 1, at 23-25; Ex. 2, at 2-4.

24. Plaintiffs' Consignment Agreements included a Pallet Delivery Addendum that nonetheless provided a separate commission structure for their participation in the PDP. Ex. 1, at 39; Ex. 2, at 18.

25. For all PDP deliveries in Plaintiffs' respective territories, PFI agreed to pay Plaintiffs a commission of 20% -- the rate specified in Schedule B of their respective Consignment Agreements -- less a per-pallet deduction.

26. The pallet deduction represented a fraction of PFI's actual costs to palletize, shrink-wrap, and deliver palletized product to customers' warehouses.

27. Under the terms of the Pallet Delivery Addendum, Plaintiffs and PFI agreed to a pallet deduction of no more than $30 per pallet "until further notice"; Plaintiffs also agreed that PFI could "at any time modify, change, or terminate the [PDP] and/or the amounts paid thereunder" with 30 days notice. Ex. 1, at 39; Ex. 2, at 18.

28. During the time he owned and operated his distributorship, Mr. Atchley's gross commission earned on PDP sales was $18,267. That commission was reduced by $3,132 in pallet deductions; accordingly, Mr. Atchley netted $15,135 in commissions under the PDP. Ex. 543.

29. During the time he owned and operated his distributorship, Mr. Gilroy's gross commission earned on PDP sales was $43,733. That commisision was reduced by $8,183 in pallet deductions; accordingly, Mr. Gilroy netted $35,550 in commissions under the PDP. Ex. 544.

30. The pallet deduction was not an investment by Plaintiffs in PFI's business and sales; instead, it offset a portion of the ordinary and reasonable business expenses incurred by PFI in the manufacturing and distribution of the palletized good, a transaction which ultimately provided a significant financial benefit to Plaintiffs.

31. Plaintiffs did not prove by a preponderance of the evidence that a pallet deduction under the PDP was (or could be) imposed on Plaintiffs without Plaintiffs contemporaneously receiving a net financial benefit of the commissions earned on the sale of that pallet.

C. **Stale Product Policies and Effects**

32. On average, food products manufactured by PFI had a 20- to 26-week shelf life. Occasionally, due to factory errors, products sometimes had a shorter-than-average shelf life ("shortcode products").

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 8

33. Once products exceeded their shelf life, measured by the date stamped on each product, those products could no longer be sold in retail stores ("stale" or "overcode" product).

34. Plaintiffs were obligated to remove stale product from retail stores within their respective territories. PFI did not receive compensation from retail stores for any stale product that was removed.

35. Each retail store individually determined what type and quantity of PFI products to stock in its store, as well as the the location and shelving space allocated for the display of PFI's products.

36. Plaintiffs were readily able to move product between stores in their respective territories. For example, Plaintiffs could move products which sold slowly at one store to a different store at which the product would sell more quickly. Plaintiffs could thus ensure that products with looming expiration dates could be placed at stores where such products were, in the experiences of the Plaintiffs, more likely to sell before the product became stale.

37. Before Plaintiffs purchased their distributorships from the owners, each was advised orally and in writing that PFI did not accept direct returns of stale products for credit unless PFI granted a written exception in particular cases. Ex. 1, at 35; Ex. 2, at 12; Exs. 13 & 14.

//

//

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 9

38. For any stale product Plaintiffs removed from stores in their respective territories, Plaintiffs were charged by PFI for the product's wholesale price ("stale charge").

39. To allow Plaintiffs to avoid stale charges, the Consignment Agreement permitted Plaintiffs to attempt to resell stale products to certain kinds of retail stores which dealt largely or exclusively in such products ("thrift stores").

40. For PFI products that Plaintiffs resold to thrift stores, Plaintiffs did not receive commission, but they also did not incur a stale charge from PFI.

41. In June 2003, PFI adopted a new stale policy in its western region, the region that included Plaintiffs' distributorships.

42. PFI's new western region stale policy limited the amount of stale product that Plaintiffs could resell to thrift stores, capping such resales at 1% of the products that PFI delivered to Plaintiff in a particular quarter. Under the policy, all stale product in excess of this 1% would be charged back to Plaintiffs by PFI.

43. In the course of performance, PFI regularly granted exceptions to the 1% stale policy in a number of circumstances, including: a) for an initial period of time when a new distributor began operating a route, b) for shortcode products, and c) individualized forgiveness of stale charges for its distributors, including Plaintiffs, upon request.

44. Mr. Gilroy was advised in writing of the 1% stale policy by a letter from Ron Woolsey dated July 8, 2003. Ex. 33.

45.  From May 3, 2003, the date Mr. Gilroy began operating his route, to August 14, 2003, the date PFI began applying the 1% stale policy to Mr. Gilroy's distributorship, Mr. Gilroy resold stale product to thrift stores without any limitation on quantity.

46.  After PFI began applying the 1% stale policy to Mr. Gilroy's distributorship, Mr. Gilroy returned $14,635.08 of stale product to PFI, which forgave the majority of these charges.

47.  During the time in which Mr. Gilroy owned and operated his PFI distributorship, PFI assessed Mr. Gilroy a total of $1,538.52 in stale charges.  Ex. 544.

48.  Mr. Gilroy did not prove by a preponderance of the evidence that any of the stale charges he incurred were attributable to product delivered under the PDP.

49.  Mr. Atchley attended an open house prior to the purchase of his distributorship.  At that open house, he was advised orally by Chris Baker of PFI's 1% stale policy.

50.  Mr. Atchley was familiar with a 1% stale policy as an industry standard, due to his extensive prior employment history with the Keebler company.

51.  Prior to closing the purchase of the distributorship, Mr. Atchley participated in a telephone call with Chris Baker, during which Mr. Baker discussed the 1% stale policy with Mr. Atchley.  Ex. 13.

52.  Mr. Atchley was advised in writing of the 1% stale policy by a letter from Ron Woolsey dated October 28, 2004.  Ex. 34.

53. Following PFI's application of the 1% stale policy to Mr. Atchley's route on November 1, 2004, Mr. Atchley returned $15,375.05 of stale product to PFI, which forgave all of those charges. Ex. 544.

54. Mr. Atchley did not prove by a preponderance of the evidence that he ever incurred any stale charges, let alone any stale charges attributable to product delivered under the PDP.

**D.   *PFI's Control of Plaintiffs' Inventory***

55. Other than in connection with the PDP, Plaintiffs did not establish by a preponderance of the evidence that PFI exercised control over Plaintiffs' inventory or required them to purchase goods or services.

56. Even if PFI did exercise control over Plaintiffs' inventory, Plaintiffs did not establish by a preponderance of the evidence that they were required to either (a) purchase goods or services at a price above the bona fide wholesale price of those goods or services, or (b) purchase a quantity of goods so unreasonably large that the goods could not be resold within a reasonable time.

57. Even if PFI did exercise control over Plaintiffs' inventory, Plaintiffs did not establish by a preponderance of the evidence that any stale charges they subsequently incurred resulted from the purchase of goods or services mandated by PFI.

**E.   *Use of PFI's Trademarks***

58. Plaintiffs were granted a limited right to use PFI's trade name, trademark, and distinguishing colors on their equipment

and supplies; however, they were expressly prohibited from using PFI's trade name and trademark in any matter that would "tend to confuse the separate identities" of PFI and its distributors. Ex. 1, at 25; Ex. 2, at 4.

59. Plaintiffs distributed PFI's products to PFI's customers. PFI's products contained PFI's trade name and/or trademarks.

60. Mr. Atchley testified that he utilized PFI's trademarks on business cards and on one business form, but that he included the word "distributor" to identify himself as an authorized distributor of PFI products. He did not provide any documentary evidence to corroborate this usage of PFI's trade name and trademarks.

61. Mr. Atchley did not prove by a preponderance of the evidence that any person believed that he was associated with PFI, its trade name, or its trademarks in any capacity other than as an authorized distributor of its products.

62. Mr. Gilroy testified that PFI's trade name and trademarks were present on the truck he purchased from Mr. Spangler to operate his route. He also testified that he occasionally received PFI-branded business forms and attire. He did not provide any documentary evidence to corroborate this usage of PFI's trade name and trademarks.

63. Mr. Gilroy did not prove by a preponderance of the evidence that any person believed that he was associated with PFI, its trade name, or its trademarks in any capacity other than as an authorized distributor of its products.

64. Plaintiffs did not offer any other credible testimony or evidence of an association between their distributorships and PFI's trade name or trademarks.

**F.   *Existence of a Marketing Plan***

65. Plaintiffs did not prove by a preponderance of the evidence that PFI exercised any measure of control over Plaintiffs': (a) hours and days of operation, (b) advertising efforts, (c) delivery equipment or storage facilities, (d) attire during work hours, (e) staffing decisions, including the hiring of employees or subcontractors, or (f) sales quotas.

66. Plaintiffs did not prove by a preponderance of the evidence that PFI provided them with financial support, other than guaranteeing the initial loan for the purchase of the distributorship.

67. Plaintiffs did not prove by a preponderance of the evidence that PFI ever audited their distributorship's financial records or inspected their storage premises or equipment.

68. PFI controlled the prices of goods sold through the PDP. However, for the products that Plaintiffs delivered to PFI's customers, Plaintiffs did not establish by a preponderance of the evidence that PFI controlled the prices of products sold in those transactions. In fact, paragraph 3(a) of the Consignment Agreement expressly left the pricing of such products to the discretion of the Plaintiffs.

69. Mr. Atchley testified that PFI arranged a meeting of several of its distributors, at which he was asked to give a

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 14

presentation to assist other distributors in increasing their business. Otherwise, Plaintiffs did not prove by a preponderance of the evidence that Plaintiffs participated in, or were required to participate in, training in the management of their respective distributorship businesses.

### III.   CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

**A.   *Standard and Burden of Proof for Plaintiffs' Claim***

1.   Plaintiffs allege their distributorships were franchises, within the meaning of Washington's Franchise Investment Protection Act, Chapter 19.100 RCW ("FIPA").

2.   Plaintiffs allege that PFI failed to comply with several of the statutory requirements imposed on franchisors by FIPA.

3.   A franchise is

> [a]n agreement, express or implied, oral or written, by which:
> (i) a person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate;
> (ii) the operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by the grantor or its affiliate; and
> (iii) the person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee.

RCW 19.100.010(6)(a).

//

//

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 15

4.   Plaintiffs bear the burden of proof to establish that their former Pepperidge Farm distributorships were franchises, as defined by FIPA.

5.   The standard of proof is a preponderance of the evidence.

**B.   *Marketing Plan***

6.   A "marketing plan," for purposes of determining whether a franchise exists, is "a plan or system concerning an aspect of conducting business."  RCW 19.100.010(11).  A marketing plan may, but need not, include one or more of the following:

> (a) price specifications, special pricing systems or discount plans; (b) sales or display equipment or merchandising devices; (c) sales techniques; (d) promotional or advertising materials or cooperative advertising; (e) training regarding the promotion, operation, or management of the business; or (f) operational, managerial, technical, or financial guidelines or assistance.

*Id*.

7.   No court interpreting FIPA has meaningfully analyzed how to determine whether a marketing plan is present.

8.   Most decisions from other jurisdictions construing similar or identical definitions of FIPA's "marketing plan" component of the statutory definition of a franchise have "stressed that the key to the existence of a 'marketing plan' is whether overall, there is a certain level of control of the franchisee's operation by the franchisor."  Douglas C. Berry et al., *State Regulation of Franchising: The Washington Experience Revisited*, 32 Seattle U. L. Rev. 811, 838 (2009) (internal quotations omitted).

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 16

9.   Under Connecticut's near-identical statutory definition of "marketing plan," as it relates to the definition of a franchise, Conn. Gen. Stat. Ann. § 42-133(e), several factors are relevant to determining whether a marketing plan exists. These factors include "the level of control the putative franchisor had over the putative franchisee's (1) hours and days of operation; (2) advertising; (3) [retail environment]; (4) employee uniforms; (5) prices; (6) trading stamps; (7) hiring; (8) sales quotas; and (9) management training." *Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 736 A.2d 824, 834 (Conn. 1999) (citing *Cons. Petrol. of Conn., Inc. v Duhan*, 452 A.2d 123 (Conn. App. 1982)). Also relevant is whether "the franchisor [10] provided the franchisee with financial support; [11] audited its books, or [12] inspected its premises." *Id.*

10.  Plaintiffs demonstrated that PFI had control over product pricing for products PFI directly sold via the PDP and provided product pricing schedules for the purpose of calculating commission. Otherwise, Plaintiffs did not prove that PFI exercised control over the prices of products that Plaintiffs sold.

11.  Plaintiffs demonstrated that PFI provided Plaintiffs with financial support by guaranteeing the initial loan to finance Plaintiffs' purchases of the distributorships. Otherwise, Plaintiffs did not prove that PFI provided them with any other financial support.

12.    Plaintiffs did not prove that their business relationship with PFI satisfied any, much less the majority, of the *Duhan* level-of-control factors.

13.    Accordingly, Plaintiffs were not granted the right to engage in their former Pepperidge Farm distributorships pursuant to a marketing plan prescribed or suggested in substantial part by PFI.

**C.    *Substantial Association with PFI's Trade Name and Trademarks***

14.    A distributor or wholesaler of a company's products is not "substantially associated" with the company's trade name or trademarks, but rather with the company's products. *Gabana Gulf Dist., Ltd. v. Gap Int'l Sales, Inc.*, 343 Fed. Appx. 258, 259 (9th Cir. 2009) (evaluating the "substantial association" element of California's statutory definition of a franchise, Cal. Bus. & Prof. Code § 20001, which is identical in all relevant respects to Washington's "substantial association" requirement).

15.    Therefore, to satisfy the "substantial association" prong of FIPA's definition of a franchise, Plaintiffs must show a substantial association with PFI's trade name or trademarks beyond the act of distributing PFI's products.

16.    Plaintiffs offered testimony, but no other evidence, of some limited association with PFI's trade name and trademarks: in Mr. Atchley's case, the use of PFI's logo on business cards and on one business form; and in Mr. Gilroy's case, the use of PFI's logo on certain business forms and his delivery trucks,

as well as the fact that PFI occasionally provided him with logo-branded attire.

17. Even if the Court found that Plaintiffs had proved by a preponderance of the evidence that they used PFI's trade name and trademarks in the fashion they allege, such association was limited and incidental.  It does not rise to the level of a "substantial association" because Plaintiffs did not prove that any other person believed or could believe that Plaintiffs were associated with PFI in any capacity other than as a mere distributor of its products.

18. Plaintiffs' operation of their former Pepperidge Farm distributorships was not substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by PFI.

**D.   *Payment of a Franchise Fee***

19. A franchise fee is "any fee or charge that a franchisee . . . is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement[.]"  RCW 19.100.010(8).

20. A franchise fee includes "any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor[.]"  *Id.*

21. A franchise fee does not include, *inter alia*, the "purchase or agreement to purchase goods at a bona fide wholesale price." *Id.*

//

22. The statutory list of exceptions for payments which would otherwise constitute a franchise fee, contained in RCW 19.100.010(8), is not exhaustive; other exceptions exist. *Corp. Res., Inc. v. Eagle Hardware & Garden, Inc.*, 115 Wn. App. 343, 348 n.3 (2003).

23. To qualify as a franchise fee, a fee must constitute an "unrecoverable investment" by the franchisee in the franchisor. *Corp. Res., Inc.*, 115 Wn. App. at 350; *see also Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 136 (7th Cir. 1990) (reaching the same conclusion under Indiana's franchise laws).

24. Ordinary business expenses are not franchise fees because they are paid during the regular course of business, not as a right to do business. *Wright-Moore Corp.*, 908 F.2d at 136 (under Indiana's statutory definition of franchise); *see also RJM Sales & Mktg. v. Banfi Prods. Corp.*, 546 F. Supp. 1368, 1373 (D. Minn. 1982) (under Minnesota's statutory definition of franchise); *Thueson v. U-Haul Int'l, Inc.*, 144 Cal. App. 4th 664, 672-76 (2006) (under California's statutory definition of franchise).

25. The pallet deductions PFI assessed against Plaintiffs were not unrecoverable investments by Plaintiffs in PFI; in fact, those deductions were merely subtractions from the commission that Plaintiffs received on the sale of the products to which the fee applied.

//

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 20

26. The pallet deduction was a portion of the ordinary and reasonable business expenses incurred by PFI in packaging and delivering palletized product to PFI's customers, which ultimately benefitted Plaintiffs through the commissions they received on the sale of such products.

27. Alternatively, the pallet deduction satisfied the "bona fide wholesale price" exception to the statute because the deduction represented a portion of the manufacturing cost of the palletized goods.

28. For these reasons, the pallet deduction does not constitute a franchise fee.

29. Plaintiffs did not pay or agree to pay, and were not required to pay, directly or indirectly, a franchise fee.

**E.    *Conclusion***

30. PFI was not a franchisor doing business in the State of Washington, as defined by FIPA.

31. Plaintiffs' Pepperidge Farm distributorships were not franchises, as defined by FIPA.

32. PFI did not violate FIPA's franchise registration requirement because PFI did not "sell or offer to sell any franchise" to Plaintiffs in Washington.  RCW 190.100.020(1).

33. PFI did not violate FIPA's requirement to provide a "disclosure document" because PFI was not a franchisor and was not required to register Plaintiffs' former distributorships as franchises.  RCW 19.100.080(1).

//

34. PFI did not "sell or offer to sell [a franchise] by means of any written or oral communication which include[d] an untrue statement of a material fact or omit[ted] a material fact" in violation of FIPA.  RCW 190.100.170(2).

35. The integration and/or non-reliance provisions of the various agreements between Plaintiffs and Pepperidge Farm are not void under RCW 19.100.220(2).

36. PFI did not violate any other provision of FIPA.

37. Plaintiffs are not entitled to recover damages, exemplary damages, attorneys' fees, or costs.

38. Plaintiffs are not entitled to obtain rescission under RCW 19.100.190(2).

39. The Court will reserve ruling on the issue of whether PFI is entitled to recover its reasonable attorneys' fees and costs incurred in this action, pursuant to RCW 19.100.190(3).

## IV.   ORDER

Accordingly, **IT IS HEREBY ORDERED:**

1. Plaintiffs' FIPA claim is hereby **DISMISSED WITH PREJUDICE.**

2. PFI shall file a memorandum in support of its request for attorneys' fees and costs pursuant to RCW 19.100.190(3), by **no later than December 19, 2012**.  That memorandum shall be accompanied by affidavits from at least two other attorneys in each geographic market in which the attorney for whom fees are sought is employed.  The affidavits must indicate the prevailing market rate in the relevant geographic community

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 22

for similar work performed by attorneys of comparable skill, experience, and reputation. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979-80 (9th Cir. 2008).

3.   In addition to its memorandum and supporting affidavits, PFI shall contemporaneously file a detailed per-task itemization of all attorneys' fees and costs incurred in this action, including a description of the task performed, the number of hours associated with that task, and the attorney's hourly rate. The itemization of requested attorneys' fees shall also be emailed to SheaOrders@waed.uscourts.gov in Microsoft Excel 2007 (or later) format.

4.   Plaintiffs shall file their memorandum in opposition to the requested fees, if any, by no later than **January 9, 2013.** PFI shall submit its reply, if any, by **January 16, 2013.** No memoranda shall exceed ten (10) pages.

5.   The Court will defer final entry of judgment until the issue of attorneys' fees and costs has been decided.

**IT IS SO ORDERED.**   The Clerk's Office is directed to enter the Court's Findings of Fact, Conclusions of Law, and Order, and to provide a copy to all counsel.

**DATED** this 6TH  day of December 2012.


                         s/Edward F. Shea
                        EDWARD F. SHEA
                 Senior United States District Judge


Q:\EFS\Civil\2004\452.ffcl.wpd

FINDINGS OF FACT, CONCLUSIONS
OF LAW, & ORDER - 23